Dated: August 2, 2013

Michael **BARRETT, IV,**
et al., **Plaintiffs,**

v.

Donald M. **CLAYCOMB,**
et al., **Defendants.**

No. 2:11–CV–04242–NKL.

United States District Court,
W.D. Missouri,
Central Division.

Sept. 13, 2013.

**1106**

Anthony E. Rothert, Grant R. Doty, American Civil Liberties Union of Eastern MO, St. Louis, MO, Jason D. Williamson, New York, NY, for Plaintiffs.

Kent L. Brown, Judith A. Willis, Missouri Law Center, Jefferson City, MO, for Defendants.

## ORDER

NANETTE K. LAUGHREY, District Judge.

In September 2011, Defendant Donald Claycomb, President of Linn State Technical College ("Linn State"), implemented a policy requiring all new Linn State students to be drug tested using urinalysis. Plaintiffs, representing a class of current and future students of the college, immediately filed suit against the Defendants in their official capacities seeking a declaratory judgment that this mandatory, suspicionless drug-testing violated their constitutional rights. Plaintiffs moved for a preliminary injunction, which this Court granted after an evidentiary hearing. Defendants filed an interlocutory appeal and the Eighth Circuit vacated the preliminary injunction, finding that Defendants had identified a special need sufficient to justify the suspicionless drug testing of some Linn State students. Specifically, the court held that the testing may be reasonable based on the "interest in deterring drug use among students engaged in programs posing significant safety risks to others." *Barrett v. Claycomb*, 705 F.3d 315, 322 (8th Cir.2013). Because Defendants' policy was constitutional as to some Linn State students who were enrolled in safety sensitive training programs, such as the Aviation Maintenance program, the Eighth Circuit rejected Plaintiffs' facial challenge. Plaintiffs thereafter clarified their claims in this Court to assert an as-applied challenge. On July 1, 2012, the Court held a second evidentiary hearing to address Plaintiffs' request for a permanent injunction on both their applied and facial challenges. Given the Eight Circuit's previous ruling on Plaintiffs' facial challenge, the primary issue to be resolved now is whether Defendants' suspicionless drug-testing policy, as applied, violates the Fourth Amendment rights of any Linn State student.[1]

## I. The Fourth Amendment and Special Governmental Needs

The Fourth Amendment protects the right of Americans to be free from unreasonable searches and seizures. It is well-established that a urine drug test constitutes a search under the Fourth Amendment. *E.g., Chandler v. Miller*, 520 U.S. 305, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997); *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir.2013). Ordinarily, a search is unreasonable if it is conducted without individualized suspicion. *Chandler*, 520 U.S. at 308, 313, 117 S.Ct. 1295; *Barrett*, 705 F.3d at 321. But there is a "closely guarded category of constitutionally permissible suspicionless searches." *Chandler*, 520 U.S. at 309, 117 S.Ct. 1295. Of particular relevance here, a suspicionless search may be reasonable if it "serves special governmental needs, beyond the normal need for law enforcement." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). If such a special need exists, a reviewing court must balance the weight of this interest against the privacy expectations intruded on by the search to determine whether the search is reasonable in the particular context. *Id.* at 665–66, 109 S.Ct. 1384; *Barrett*, 705 F.3d at 322.

Because the constitutionality of a suspicionless search is a "context-specific inquiry," *Chandler*, 520 U.S. at 314, 117 S.Ct. 1295, the Court must make a program-by-program assessment of the activities engaged in by the students enrolled at Linn State. *See Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 866–67 (11th Cir.2013) ("[T]he test we apply is a job-category-by-category balancing of the individual's privacy expectations against the Government's interests, ...." (quotation omitted)); *Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack*, 681 F.3d 483, 489, 492 (D.C.Cir.2012) ("[T]he Supreme Court has differentiated between job categories designated for testing, rather than conducting the balancing test more broadly ...."). And the Court must evaluate each program offered at Linn State to ensure that the category of students subject to the drug-testing policy has not been defined more broadly than necessary to meet the policy's purposes. *See Von Raab*, 489 U.S. at 678, 109 S.Ct. 1384. With respect to each program, the Court must balance the special need asserted by Defendants [2] against Plaintiffs' reasonable

---

1. In finding that Plaintiffs had not met their burden for a facial challenge, the Court of Appeals emphasized that its decision rested "heavily on the nature of the relief [Plaintiffs] sought by way of a preliminary injunction." *Barrett*, 705 F.3d at 320–21, 324. Because Plaintiffs brought a facial challenge, they had to show that "no set of circumstances exists under which the [drug-testing policy] would be valid." *Id.* at 321 (quotation omitted). However, the Eighth Circuit acknowledged that "Linn State's drug-testing policy may have some unconstitutional applications." *Id.* at 324.

2. The Eight Circuit only identified one purpose for Linn State's drug testing policy that might render it constitutional. That purpose was "deterring drug use among students engaged in programs posing significant safety risks to others." *Barrett*, 705 F.3d at 322. Although the evidence shows that safety was only one of the many stated purposes of the challenged drug-testing policy, Defendants have not argued that any of the policy's other purposes, such as "[a]ssist[ing] students in making safe and healthier choices," [Plaintiffs' Exhibit 6], provides a justification that would render this suspicionless search constitutional. Accordingly, as there has been no suggestion that these other purposes provide a recognized, constitutional justification for imposing a suspicionless search, the Court's discussion of the constitutionality of the drug-testing policy is limited to safety concerns

privacy expectations to determine whether the search is reasonable. *See id.* at 665–66, 109 S.Ct. 1384; *Barrett,* 705 F.3d at 322. Three factors guide this analysis: "(1) 'the nature of the privacy interest allegedly compromised by the drug testing'; (2) 'the character of the intrusion imposed by the Policy'; and (3) 'the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them.' " *Barrett,* 705 F.3d at 322 (quoting *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls,* 536 U.S. 822, 830, 832, 834, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002)).

## II. Evidentiary Issues

There is some dispute as to whether the evidence presented at the preliminary injunction hearing automatically became part of the record for the permanent injunction hearing. Due to the unique characteristics of a motion for a preliminary injunction, which by its nature often requires an expeditious hearing and decision, evidence that would ordinarily be inadmissible, such as affidavits, may be received at a preliminary injunction hearing. *See Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation,* 507 F.2d 1281, 1286–87 (8th Cir.1974); *see also Sierra Club, Lone Star Chapter v. F.D.I.C.,* 992 F.2d 545, 551 (5th Cir.1993). With respect to whether evidence received on a motion for a preliminary injunction also becomes part of the trial record, Federal Rule of Civil Procedure 65(a)(2) provides that "evidence that is received on the motion *and that would be admissible at trial* becomes part of the trial record and need not be repeated at trial." (emphasis added).

At the preliminary injunction hearing, Defendants submitted a number of affidavits from various Linn State faculty members. On Plaintiffs' motions in limine, these affidavits were excluded from the trial record as inadmissible hearsay. At trial, however, the parties stipulated to the admission of eight of these affidavits. Consequently, only those affidavits that were admitted pursuant to the stipulation will be considered by the Court. Pursuant to Rule 65(a)(2), the other evidence offered at the preliminary injunction hearing will be considered part of the trial record to the extent that it is admissible under the Federal Rules of Evidence.

## III. Burden of Proof

■ Once Plaintiffs show that a suspicionless search has occurred, there is a presumption that it is unconstitutional. *Scott,* 717 F.3d at 866–67. The burden of production then shifts to the government to show either consent or a recognized exception to the Fourth Amendment. *Der v. Connolly,* 666 F.3d 1120, 1127–29 (8th Cir.2012). While the "risk of non-persuasion must remain squarely on the plaintiff," *id.* at 1128 (quotation omitted), if the government does not produce evidence to support a recognized exception to the Fourth Amendment, the presumption prevails.

Applying this rule in cases involving suspicionless drug testing, the Eleventh Circuit has held that such a search cannot be upheld where the testing proponent fails to present evidence to support the special need that justifies the search. *Scott,* 717 F.3d at 880–82 (citing, *inter alia, Der,* 666 F.3d at 1127–28; *Valance v. Wisel,* 110 F.3d 1269, 1279 (7th Cir.1997)); *Lebron v. Sec'y, Fla. Dep't of Children & Families,* 710 F.3d 1202, 1211 n. 6, 1213 (11th Cir. 2013). As discussed at length by the court in *Scott,* requiring this threshold showing has considerable support in the Supreme

proffered by Defendants and relied on by the Eighth Circuit Court of Appeals.

Court's precedent on suspicionless searches. *See Scott,* 717 F.3d at 881; *see also Chandler,* 520 U.S. at 318–19, 117 S.Ct. 1295 (striking down a suspicionless drug-testing statute where the state *"failed to show,* in justification of [its drug-testing statute], a special need" (emphasis added)); *Von Raab,* 489 U.S. at 677, 109 S.Ct. 1384 (finding that *"the Government has demonstrated* that its compelling interests ... outweigh the privacy expectations of employees." (emphasis added)); *Lebron,* 710 F.3d at 1211 n. 6 ("[T]he Supreme Court has unequivocally stated that it is the state which must show a substantial special need to justify its drug testing.").

Similarly, in *Doe ex rel. Doe v. Little Rock Sch. Dist.,* 380 F.3d 349, 356 (8th Cir.2004), the Eighth Circuit held that a suspicionless search was unreasonable where the defendant school district *"failed to demonstrate* the existence of a need sufficient to justify" the search. *Little Rock Sch. Dist.,* 380 F.3d at 356–57 (emphasis added). In reaching this conclusion, the court rejected the school district's "generalized concerns about the existence of weapons and drugs in its schools," because there was "nothing in the record regarding the magnitude of any problems with weapons or drugs that it has actually experienced." *Id.* at 356. The court concluded that the suspicionless search at issue could not be upheld based on an alleged special need that was substantiated by nothing more than "a mere apprehension" or "assertion." *Id.* at 356–57; *accord Scott,* 717 F.3d at 877.

Defendants thus bear the burden of producing evidence to show that their case falls within the limited circumstances in which suspicionless searches are permissible based on a concrete safety concern.

*See Der,* 666 F.3d at 1128–29; *see also Chandler,* 520 U.S. at 308, 117 S.Ct. 1295; *Scott,* 717 F.3d at 880. Only if Defendants have produced evidence of a special need with respect to a particular program is it necessary to balance Plaintiffs' reasonable privacy expectations against Defendants' interests to determine the reasonableness of the search. *See Scott,* 717 F.3d at 880; *Lebron,* 710 F.3d at 1207; *see also New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring).

## IV. Findings of Fact

The facts in this case are largely undisputed except for the central question of which Linn State programs pose a substantial risk of harm to others.[3]

Founded in 1961, Linn State is a public, two-year college located in Linn, Missouri. Linn State was established and continues to operate under Missouri statutes. It is governed by a Board of Regents, which is comprised of members appointed by the Governor of Missouri and confirmed by the Missouri Senate. The Board of Regents is responsible for establishing the policies of Linn State.

Defendants Toni R. Schwartz, John Klebba, Diane Benetz, Mark J. Collom, Erick V. Kern, and J. Scott Christianson are members of Linn State's Board of Regents. An additional defendant, designated simply as "Member, Linn State Technical College Board of Regents," refers to the yet to be appointed replacement for Defendant Kenneth L. Miller, who died during the course of this litigation. Defendant Donald M. Claycomb is the President of Linn State and is responsible for implementing the policies established by the Board of Regents.

---

**3.** The question of which programs pose a substantial risk of harm to others is addressed separately, *infra,* Application of Facts to Law section.

Linn State offers at least twenty-eight distinct academic programs for the roughly 1100 to 1200 students who attend the institution. The academic programs offered at Linn State are divided into five, general categories: mechanical, electrical, civil, computer, and general education. Each of these programs is further divided into more specialized areas. As a technical school, many of the programs offered at Linn State involve a significant amount of hands-on training and manual exercises.

Over the course of Linn State's fifty-year history, there has never been an accident on campus that resulted in death or substantial bodily injury. There have been accidents that have required some medical attention, but there is no evidence that drug use caused or contributed to any accident in Linn State's history.

Linn State does not have any greater prevalence of drug use among its students than any other college. However, on June 17, 2011, Linn State's Board of Regents adopted a drug screening policy, which requires nearly every incoming Linn State student to participate in drug testing by urinalysis in accordance with procedures prescribed by President Claycomb. The June 17, 2011 testing policy also requires drug testing of students returning to Linn State after an absence of six months or more. The drug testing program is mandatory and suspicionless.

The stated purpose of the June 17, 2011 testing policy provides:

> The mission of [Linn State] is to prepare students for profitable employment and a life of learning. Drug screening is becoming an increasingly important part of the world of work. It is also believed it will better provide a safe, healthy, and productive environment for everyone who learns and works at [Linn State] by detecting, preventing, and deterring drug use and abuse among students.

The educational purpose of the drug-testing policy, namely preparing students for employment in fields in which drug testing might be required, is the primary reason the policy was implemented. In addition, the Board of Regents adopted the following six "Program Goals," which set forth the other purposes of this policy: 1.) assisting students in making safe and healthier choices; 2.) supporting students who are drug free; 3.) improving the learning environment; 4.) decreasing the number of students placed on academic probation and academic suspension; 5.) improving Linn State's retention rate; and 6.) improving Linn State's graduation rate.

The June 17, 2011 testing policy does not apply to Linn State faculty or staff members. Linn State's rules and procedures do permit drug testing employees prior to employment, after any accident, and upon reasonable suspicion, but Linn State does not currently drug test any faculty or staff members who participate in the College's training programs. The policy statement regarding the drug testing of Linn State employees states that the College's "faculty and employees are entrusted to safely operate the vehicles, machinery and equipment used to train our students and operate our institution." Nonetheless, Linn State chooses not to test faculty and staff members in the manner provided for in its rules and procedures.

On September 6, 2011, President Claycomb signed a series of procedures by which Linn State would conduct the drug testing of its students. These written procedures provided that students could petition Linn State's President to be excused from participation in the drug-testing program. Linn State began drug testing students pursuant to this policy on September 7, 2011, one day after the above procedures were adopted.

Linn State's drug-testing policy is not intended to be punitive and is not used for law enforcement purposes. Pursuant to Linn State's drug-testing policy, a student who initially tests positive for any of the drugs Linn State tests is given forty-five days to be retested and is not excluded from class during this period. If a retest is negative, the student is permitted to remain enrolled at Linn State, on disciplinary probation and subject to a random drug screen later in the year. Student-initiated or administrative withdrawal from Linn State is required if the retest returns any positive result or if the student refuses the retest.

Prior to the adoption of the challenged testing policy, students enrolled in Linn State's Heavy Equipment Operations program were subject to suspicionless and random drug testing. Students in this program who failed a drug test were permitted to reenroll in other programs offered at Linn State. The drug testing of Heavy Equipment Operations students has continued unabated during the course of this lawsuit. Students in this program are not subject to the drug-testing policy at issue in this case.

Prior to the adoption of the challenged testing policy, some Linn State students were subject to drug testing in connection with voluntary or required off-campus internships in their field of study. This testing is not at issue in this case and has continued unabated during the course of this lawsuit.

Prior to the adoption of the challenged testing policy, Linn State students seeking a Commercial Driver's License were subject to federally mandated suspicionless and random drug testing. This testing is not at issue in this case and has continued unabated during the course of this lawsuit.

Prior to the adoption of the challenged testing policy, Linn State's rules and regulations permitted suspicion-based drug testing of students as well as drug testing of students involved in accidents on Linn State's property or with a Linn State vehicle. This testing is not at issue in this case and Linn State's ability to require testing in these circumstances has continued unabated during the course of this lawsuit. From 2007–2012, only one Linn State student was drug tested following an accident, and this student did not test positive.

Linn State is an arm of the State of Missouri and all Defendants acted under color of state law in developing, approving, and implementing the challenged drug-testing policy.

## V. Conclusions of Law

### A. Parameters of the special need/safety-exception to the Fourth Amendment

The Eighth Circuit found that Linn State's drug-testing policy was constitutional as to some students because the University had an interest in "deterring drug use among students in programs posing significant safety risk to others." *Barrett,* 705 F.3d at 322. To reach that conclusion, the Eighth Circuit drew an analogy to the safety interest identified in *Skinner* and *Von Raab. See id.* at 322. This has three important implications. First, to be analogous to the safety risks at issue in those cases, the activities performed by students at Linn State must pose such a threat that "even a momentary lapse of attention can have disastrous consequences," *Skinner,* 489 U.S. at 628, 109 S.Ct. 1402. This is the language relied on by the Eighth Circuit. *Barrett,* 705 F.3d at 322. As the D.C. Circuit has explained:

The public safety rationale adopted in *Von Raab* and *Skinner* focused on the

**1112**

*immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs.

*Harmon v. Thornburgh,* 878 F.2d 484, 491 (D.C.Cir.1989); *accord Am. Fed'n of Gov't Emps. v. Cheney,* No. C–88–3823–DLJ, 1992 WL 403388, at *4 (N.D.Cal. Aug. 14, 1992); *Burka v. N.Y.C. Transit Auth.,* 739 F.Supp. 814, 821 (S.D.N.Y.), decision supplemented, 751 F.Supp. 441 (S.D.N.Y. 1990).

█ Second, to override the ordinary requirements of the Fourth Amendment, the safety risks at issue must be of a unique or unusual degree. *Cf. Von Raab,* 489 U.S. at 674, 109 S.Ct. 1384 (finding that "the almost unique mission" of the employees subject to the drug testing program presented "extraordinary safety and national security hazards"). Certainly, there are innumerable common, daily activities that, if performed under the influence of an illicit drug, could fairly be said to pose a significant safety risk to others— for instance driving a car. As a result, if any modicum of danger was deemed sufficient to justify drug testing, then there would be no principled reason why the government could not subject every person seeking or holding a driver's license to suspicionless drug testing. But the Court is not aware of any authority that supports such an expansive reading of the safety exception and, in fact, courts have rejected drug testing policies that applied to per-

sons who operated motor vehicles under ordinary driving conditions. *See Nat'l Treasury Emps. Union v. Watkins,* 722 F.Supp. 766, 769–70 (D.D.C.1989) (enjoining the drug testing of employees whose job duties included driving cars and vans based on the finding that "the safety risks involved with the motor vehicle operators carrying-out their duties are no greater than the normal risks associated with vehicle use by the general public."); *Nat'l Treasury Emps. Union v. Lyng,* 706 F.Supp. 934, 947 (D.D.C.1988) (same). It is only by examining the character of the risk at issue that courts can establish "an outer limit on the nature of the safety threat that justifies random drug testing," *Krieg v. Seybold,* 481 F.3d 512, 518 (7th Cir.2007). If suspicionless searches are to remain "particularized exceptions" to the Fourth Amendment, *Chandler,* 520 U.S. at 313, 117 S.Ct. 1295, the applicability of the safety exception must be limited to circumstances that present unique safety hazards.

Third, the safety risk must be to others, as opposed to the individual student performing the task. The Eighth Circuit in its opinion said: "the public has a valid interest in deterring drug use among students engaged in programs posing significant safety risks *to others."* *Barrett,* 705 F.3d at 322 (emphasis added). Furthermore, all of the cases that have upheld suspicionless drug testing relied on the risk of harm to others, not the person being searched.[4] The parties have not cited, and the Court's independent research has not revealed, any case that upheld suspicionless drug testing based on a safety rationale absent a showing that the asserted safety concern applied to oth-

**4.** *See Krieg,* 481 F.3d at 518; *Bluestein v. Skinner,* 908 F.2d 451, 456 (9th Cir.1990); *Am. Fed'n of Gov't Emps., AFL–CIO v. Skinner,* 885 F.2d 884, 891–92 (D.C.Cir.1989); *Cheney,* 1992 WL 403388, at *4; *Plane v.* *United States,* 796 F.Supp. 1070, 1075 (W.D.Mich.1992); *Middlebrooks v. Wayne Cnty.,* 446 Mich. 151, 521 N.W.2d 774, 779–80 (1994).

ers, as opposed to just the individual who is subject to the testing. *Accord Cheney*, 1992 WL 403388, at *4 ("Every recent case on drug testing raising the safety nexus involved a testing program that threatened members of the public."); *see also Int'l Bhd. of Elec. Workers, Local 1245 v. Skinner*, 913 F.2d 1454, 1462 (9th Cir.1990).

Consequently, to the extent that Defendants rely on the risk of harm to the individual students themselves, the Court declines to uphold the drug-testing policy based on such an unprecedented basis. Rather, the Court will focus, as the Eighth Circuit did, on whether a particular program poses a significant safety risk to others.

In addition, the Supreme Court has held that, to justify suspicionless drug testing based on a special need, "the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318, 323, 117 S.Ct. 1295 ("[W]here … public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."). Thus, in order to justify the search at issue in this case, the existence of the special need with respect to each program must be supported by more than a mere apprehension or assertion. *See Little Rock Sch. Dist.*, 380 F.3d at 356–57; *see also Lanier v. City of Woodburn*, 518 F.3d 1147, 1150–51 (9th Cir.2008).

Requiring this showing is indispensable, as permitting suspicionless drug testing on the basis of a hypothetical or unsubstantiated safety interest would encourage the bare recitation or post hoc assertion of illusory safety concerns in order to justify drug-testing policies that are in truth en-

acted to serve entirely different, unconstitutional purposes. Opening the door to expansive and widespread testing in this manner would significantly erode the protections of the Fourth Amendment, which the Supreme Court has "has consistently asserted" to be "of the very essence of constitutional liberty," *Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and "basic in free society," *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The risk of using illusory safety concerns to mask unconstitutional purposes is apparent in this case, as the evidence shows that the adoption of Linn State's drug-testing policy was motivated predominantly by considerations other than the safety interest ultimately relied upon by Defendants in response to this litigation. The six "Program Goals" adopted by the Board of Regents do not even mention preventing accidents or injuries caused or contributed to by drug use, and instead focus on goals like improving retention and graduation rates. [Plaintiffs' Exhibit 4]. Likewise, the minutes from an advisory committee meeting show that Dr. Claycomb, in discussing the proposed drug-testing policy, told the committee "that parents want their kids to attend a school that enforces a drug free environment," and that, "[t]his alone could up the enrollment numbers." [Plaintiffs' Exhibit 5]. There is no indication in these minutes that any concern for reducing or preventing drug-related accidents was also discussed. Furthermore, based on the President of the Board of Regents' testimony at trial, the primary purpose of the policy was educational in nature, namely preparing students for employment in fields in which drug screening might be required. This testimony is consistent with the other evidence in the trial record, including the

minutes from the Board of Regents meeting at which the drug-testing policy was adopted and the testimony of Dr. Claycomb and Dr. Pemberton. *See* [Plaintiffs' Exhibit 4]; [Doc. # 92 at 21, 116–17].

This is not to say that any of these other purposes are unimportant or invidious, but they do not provide a recognized justification for overriding the constitutional protections of the Fourth Amendment. Consequently, it is necessary to scrutinize in a meaningful way, government claims that safety concerns justify a suspicionless search, or else oblique references to safety may become a carte blanche for suspicionless searches conducted for reasons that fall well beyond the limited, permissible exceptions to the Fourth Amendment.

Accordingly, only evidence of a substantial and concrete risk to others can justify the suspicionless search at issue in this case.

### B. The nature of Plaintiffs' privacy interest

It is well-settled that "the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." *Skinner*, 489 U.S. at 617, 109 S.Ct. 1402. Nonetheless, in some circumstances, individuals may have a diminished expectation of privacy with respect to the content of their urine. *E.g., id.* at 627, 109 S.Ct. 1402 ("[T]he expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees."). Regarding the students at Linn State specifically, the Eighth Circuit found that "some college students that attend Linn State have a diminished expectation of privacy because they are seeking accreditation in heavily regulated industries and industries where drug test-

ing, in practice, is the norm." *Barrett*, 705 F.3d at 323. Consequently, where the evidence shows that students in a particular program are seeking accreditation in a heavily regulated industry or industries in which drug testing is the norm, the Court will take into account the diminished privacy expectations of these students. However, Defendants have not presented any other recognized basis for finding that Linn State students have limited privacy expectations. Accordingly, where there is little or no evidence suggesting that students in a given program are entering such a heavily regulated field, these students will be considered to have the full privacy expectations common to all adults, which are substantial. *See Von Raab*, 489 U.S. at 671, 109 S.Ct. 1384.

### C. The character of the privacy intrusion

On appeal, the Eighth Circuit found that the manner in which Linn State's drug testing is conducted is "relatively noninvasive." *Barrett*, 705 F.3d at 323. This conclusion was based in part on the fact that the policy's written procedures provide that "the testing will be conducted in accordance with federal drug-testing procedures outlined in 49 C.F.R. Part 40, which 'significantly minimize the program's intrusion on privacy interests.'" *Id.* (quoting *Von Raab*, 489 U.S. at 672, 109 S.Ct. 1384). In addition, the Eighth Circuit relied on the facts that: "[t]he testing is not random and students are given notice of the testing and procedures used. The testing does not reveal any medical condition about the student other than the presence of certain drugs, and any positive results are not relayed to law enforcement." *Id.*

Plaintiffs argue that the evidence received at trial shows that the drug-testing policy actually omits certain protections

that are contained in the federal drug-testing procedures. Specifically, Linn State's drug testing procedures differ from the procedures outlined in the federal regulations in the following seven respects:

1. The regulations limit testing to five drugs—and explicitly prohibit testing for other drugs, 49 C.F.R. § 40.85, whereas Linn State tests for eleven types of drugs, [Plaintiffs' Exhibit 6].

2. The regulations only require persons who test positive to be removed "from performing safety-sensitive functions," 49 C.F.R. § 40.23, whereas Linn State ultimately mandates complete withdrawal from the College, [Plaintiffs' Exhibit 54].

3. The regulations require that initial positive results be given directly, and only, to a Medical Review Officer ("MRO") to verify the results—including privately discussing possible causes of a false positive with the individual, 49 C.F.R. §§ 40.97(b), 40.121–40.169, whereas under the contract Linn State executed with Employee Screening Services ("ESS"), the testing entity must receive permission from Linn State before sending any positive tests to an MRO, [Plaintiffs' Exhibit 24 at 2].

4. Unlike the federal regulations, Linn State's policy does not permit an individual who tests positive to request a second test of "the split specimen" to be conducted by a different laboratory before the positive result is verified and reported, see 49 C.F.R. §§ 40.153, 40.171–40.189.

5. The regulations permit only the MRO to request and review medical and prescription information from an individual and only after a positive result, 49 C.F.R. § 40.129, whereas Linn State requires stu-

dents who petition for a waiver in advance or contest a positive result to submit this private information directly to Linn State's President.

6. The regulations contain strict confidentiality provisions, see 49 C.F.R. § 40.165, whereas Linn State's policy only prohibits sharing results with law enforcement and specifically contemplates sharing results with parents of students under the age of twenty-one, [Plaintiffs' Exhibit 16].

7. Under the regulations, an individual may be charged for testing only when that person requests the optional retest of the split-sample and, even then, only when the individual is willing and able to pay, 49 C.F.R. § 40.173, whereas Linn State students are assessed a $50.00 fee for the drug testing, [Plaintiffs' Exhibit 8].

As to the issue of private medical information, Plaintiffs have failed to prove that they are required to submit confidential medical information to Linn State faculty, either before or after the drug screening. At trial, Dr. Richard Pemberton, Linn State's Associate Dean of Student Affairs, testified that it was Linn State's policy to have any positive result sent to an MRO, who would review it and contact the student about any potential causes of a false positive. Plaintiffs attempted to impeach this testimony using the contract executed with ESS, but this contract provides only that the testing provider must receive permission before sending positive results to an MRO. [Plaintiffs' Exhibit 24 at 2]. This requirement, on its own, fails to establish that positive results would not be sent to an MRO but instead directly to Linn State. In addition, Dr. Pemberton testified that it was his understanding that Linn State gave ESS permission to send all positive tests to an MRO. Furthermore, Linn

State's "Frequently Asked Questions" document provides, "Q = Should I report any prescriptions that I am taking at the time of the screening? A = No. If you have a positive result the Medical Review Officer will contact you directly for a legitimate medical explanation for the drugs detected in the screening." [Plaintiffs' Exhibit 8]. Thus, the evidence does not show that Linn State's testing procedures differ meaningfully from the federal regulations with respect to the release of confidential medical information.

Nor is there a reason to alter the Eighth Circuit's conclusion that the policy is "relatively noninvasive", simply because lawful prescription drugs are included in the drug screen. Plaintiffs do not dispute that even a lawfully prescribed drug can impair an individual's ability to engage in safety-sensitive activities, so this distinction does not render the policy sufficiently distinguishable from the federal regulations to make it measurably more burdensome.

With respect to the remaining issues raised by Plaintiffs, several of these, including the fee assessed to the students and the lack of an optional retest of a split specimen, reflect only minor or technical deviations from the federal regulations. Thus, the Court finds that these variations do not significantly increase the character of the privacy intrusion, especially considering that Linn State's testing procedures parallel and in some ways are even less intrusive than those upheld in *Earls* and *Vernonia. Cf. Earls*, 536 U.S. at 832–33, 122 S.Ct. 2559; *Vernonia School District 47J v. Acton*, 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). To the extent that Linn State's policy mandates withdrawal from the College, this intrusion is mitigated by the fact that, prior to incurring any adverse consequences, students have the chance to pass a second drug test forty-five days after the first. [Plaintiffs'

Exhibit 54]. Furthermore, Plaintiffs do not contest the other facts cited by the Eighth Circuit in finding that the testing is "relatively noninvasive," including, among others, the fact that "the testing does not reveal any medical condition about the student other than the presence of certain drugs." *Barrett*, 705 F.3d at 323.

All that remains, then, is Plaintiffs' concern with the confidentiality provisions of the drug-testing policy. The testing procedures signed by Dr. Claycomb do contain strict confidentiality requirements, but the policy adopted by the Board of Regents specifically provides that "[p]arental notification ... is appropriate for students under the age of 21 or dependent students." [Plaintiffs' Exhibit 16]. Although the trial record is not clear as to whether Defendants actually would notify parents of positive results, the explicit reservation of the right to do so increases the intrusiveness of this policy. Consequently, while the character of the privacy intrusion is not so substantial as to render the entire drug-testing policy unreasonable, the Court will consider the heightened intrusiveness of the policy when balancing the parties' competing interests.

**D. The immediacy of Defendants' concerns and the efficacy of the drug-testing policy in meeting them**

With respect to the immediacy of Defendants' interest in deterring drug use, it is relevant, but not dispositive, that the record in this case is almost devoid of any particularized evidence of drug use among Linn State's students. There is also no evidence suggesting that drug use has ever caused or contributed to an accident involving a Linn State student. While such evidence "is not in all cases necessary to the validity of a testing regime," it "would shore up an assertion of special need for a

suspicionless general search program. Proof of unlawful drug use may help to clarify—and to substantiate—the precise hazards posed by such use." *Chandler,* 520 U.S. at 319, 117 S.Ct. 1295; *accord Little Rock Sch. Dist.,* 380 F.3d at 356; *see also Scott,* 717 F.3d at 877–78 ("Nor does the State shore up its case for across-the-board, suspicionless drug testing with evidence of a preexisting drug problem.... The bulk of the evidence canvasses the prevalence and harms of drug use in the general population. But Supreme Court case law contemplates a more targeted showing of drug abuse *in the group to be tested,* not people as a whole."); *Lebron,* 710 F.3d at 1212 ("[T]he State failed to offer any factual support or to present any empirical evidence of a 'concrete danger' of illegal drug use within Florida's TANF population.... Thus, unlike *Skinner, Vernonia,* and *Earls,* in which the government presented evidence of drug use within the affected populations, here, the State presented no empirical evidence to bolster its special needs argument that suspicionless drug testing of TANF applicants is in any way warranted."). That said, these deficiencies, on their own, do not render Defendants' drug-testing policy unreasonable, per se, if the students are enrolled in programs that pose significant safety concerns. *See Barrett,* 705 F.3d at 323 ("In the end, the need to prevent and deter the substantial harm that can arise from a student under the influence of drugs while engaging in a safety-sensitive program provides the necessary immediacy for Linn State's testing policy.").

Regarding the efficacy of the drug-testing policy, Plaintiffs argue at length that a one time, preannounced drug test is not effective. In support, Plaintiffs cite the testimony of their expert witness, Melanie Ziebart. Ziebart offered a number of uncontroverted criticisms regarding the efficacy of Defendants' drug-testing policy.

Based on her education, training, and experience, Ziebart concluded that this policy does not advance Defendants' asserted safety interest or deter or prevent future drug use. *E.g.,* [Plaintiffs' Exhibit 28 at 3, 6–8]. In addition, Ziebart presented a variety of reasons why the specific drug-testing procedures at issue in this case may be unreliable, which could result in the removal of students who do not engage in illicit drug use while overlooking students who do. *E.g.,* [Plaintiffs' Exhibit 28 at 6, 7–8].

While this testimony provides evidentiary support for Plaintiffs' critiques of Defendants' drug-testing policy, Plaintiffs' arguments as to how these criticisms affect the reasonableness of the drug-testing policy are substantively identical to those that, on appeal, the Eighth Circuit found "unpersuasive." *Barrett,* 705 F.3d at 323–24. Plaintiffs argue that circumstances have changed because Ziebart's testimony shows that the drug-testing policy is not effective at all, as opposed to simply being a less effective option. Yet, Ziebart conceded on cross-examination that it was not her opinion that the drug-testing policy would be wholly ineffective at detecting individuals who have used drugs.

## VI. Application of Facts to Law

### A. Aviation Maintenance, Electrical Distribution Systems, Heavy Equipment Operations, and Industrial Electricity

 The Eighth Circuit explicitly considered three programs offered at Linn State: 1) Aviation Maintenance, 2) Heavy Equipment Operations, and 3) Industrial Electricity. *Id.* at 319. With respect to the Aviation Maintenance and Industrial Electricity programs, the trial record contains, in all crucial respects, the same evidence that was before the Court of Ap-

peals. As these were the programs that motivated the Eighth Circuit's decision, the Court finds, for the reasons set forth in that decision, that Linn State's drug-testing policy is constitutional as applied to students enrolled in the Aviation Maintenance and Industrial Electricity programs. With respect to the Heavy Equipment Operations program, however, it became apparent at trial that the drug testing of the students in this program is not at issue in this case. Specifically, Dr. Pemberton testified that the students in this program are subject to a separate drug-testing requirement and consequently are not subject to the challenged drug-testing policy. Accordingly, it is not necessary to consider the reasonableness of Linn State's drug-testing policy with respect to the Heavy Equipment Operations program because this policy does not apply to this program.

The drug testing policy, however, does apply to students enrolled in the Electrical Distribution Systems program and the Court finds that those students perform safety-sensitive tasks, similar to the tasks found by the Eighth Circuit to be sufficient to justify Linn State's drug testing policy. Electrical Distribution students work with power lines, climb forty-foot poles, and operate digger derricks and bucket trucks. [Defendants' Exhibit 35]. According to Dr. Pemberton's testimony at trial, these students also auger the holes necessary to plant these poles, wire the poles using electrical wiring and bracings, and operate large trucks with booms. In addition, all of these students are required to complete internships for graduation and all of these internships require drug testing. [Defendants' Exhibit 35].

Erecting, climbing, and wiring forty-foot power poles, and operating the heavy equipment necessary to accomplish these tasks, presents a concrete risk of injury to others in the vicinity. These risks are at least as substantial as those posed by the activities of the students in the Aviation Maintenance program, who "work in close proximity to active propeller blades" and "taxi airplanes," which the Eighth Circuit found sufficient to justify the drug-testing policy, *Barrett*, 705 F.3d at 319, 322. In addition, as with the students in the Industrial Electricity program, the fact that internships are required for the Electrical Distribution Systems program shows that the potential hazards involved in this program are not confined to Linn State's campus. *Cf. id.* Moreover, the fact that drug testing is required for all of these internships suggests that drug testing is the norm in this field. Consequently, the Court finds that Linn State's drug-testing policy is constitutional as applied to students in the Electrical Distribution Systems, Aviation Maintenance, and Industrial Electricity programs.

**B. Auto Body, Auto Mechanics, Heavy Equipment Technology, Medium/Heavy Truck Technology, CAT Dealer Service Technician, and Power Sports**

The only evidence in the record regarding any safety risks associated with the Auto Body and Auto Mechanics programs is the testimony of the Department Chair of these programs, Jimmy Brandon. When asked to describe the "most dangerous" aspects of the training involved in these programs, Brandon testified that students lift cars with jack stands, handle chemicals like refrigerants, and use washers, air tools, presses and other hand tools such as hammers. [Doc. # 92 at 102–03]. Brandon did not, and in fact was not asked to, provide any further context or elaboration as to how these activities pose a significant safety risk, either to the individual students themselves or to the people around them. Consequently, the only evidence before the Court with respect to

whether these programs pose a significant safety risk to others is Brandon's brief and conclusory list of the equipment and materials that might be used by the students in these programs.

From this testimony, the equipment used by these students appears to be, in large part, no different than that which might be found in any household garage. Even assuming that Brandon's limited testimony permits some inference of a safety risk, it would be pure conjecture to find, based on this evidence, that the work of these students is "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences," *Skinner*, 489 U.S. at 628, 109 S.Ct. 1402. *Cf. Lebron*, 710 F.3d at 1213 ("[T]he Supreme Court has required that a state must present adequate factual support that there exists a 'concrete danger,' not simply conjecture . . . ." (quoting *Chandler*, 520 U.S. at 319, 117 S.Ct. 1295)).

Although Brandon offered no testimony as to whether serious injuries are even possible in these programs, he did testify that "[v]ery, very few" students have been injured in these programs in the last five years and that the injuries that did occur were all "minor," such as "mashed fingers, scrapes, cuts, and . . . gasoline in the eye." [Doc. # 92 at 104–05]. Defendants cite no authority that suggests the risk of a hurt finger or a scrape poses the type of substantial and real public safety risk that is required to justify suspicionless drug testing. *Cf. Chandler*, 520 U.S. at 318, 117 S.Ct. 1295. To find a special need on this record, would open the door to almost unlimited drug testing of many college students and others involved in any government sponsored activity who *might* be exposed to such minimal injuries. This is clearly not contemplated by the limited circumstances in which the courts have permitted drug testing of public employees

or recipients of government services. This is not to say that a state actor must wait for a serious injury to occur before being permitted to drug test an employee or program participant. But the evidence of minimal injuries at Linn State and the absence of any evidence of problems at other schools like Linn State, or from the automotive industry generally, persuade the Court that the risk of any harm to students in the automotive program is minimal and the harm likely to be suffered is not substantial. Had there been evidence to the contrary either at Linn State or elsewhere, the Court would have expected to hear it, given the opportunities provided to Defendants to present their factual record.

Furthermore, there is evidence that the students in the Auto Body and Mechanics programs are highly supervised and subject to a number of faculty-enforced safety precautions. For instance, these students are required to wear safety glasses, attend safety instruction at the start of each semester, and pass a safety test before they are allowed to go into the lab. [Doc. # 92 at 104]. In addition, these students are supervised closely enough for the faculty to ask a student to leave the shop if she is acting erratically. [Doc. # 92 at 105]. Although these students sometimes work on vehicles owned by people in the local community, the instructors are required to test drive these vehicles before they are returned to their owners, [Doc. # 92 at 103, 105], which substantially mitigates any immediate risk to the public. *Cf. Harmon*, 878 F.2d at 491 ("The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an op-

portunity to intervene before the harm occurs."). Thus, to the extent that there are any safety concerns associated with these programs, it appears that faculty supervision and faculty-enforced safety measures effectively mitigate them, as evidenced by Brandon's testimony regarding the very limited number and trivial nature of the injuries that have been sustained by the students in these programs. *See* [Doc. # 92 at 104–05].

In addition, there is no evidence that students in the Auto Body and Mechanics programs are entering a heavily regulated field or a field in which drug testing is the norm. In *Skinner*, the Court found that the railroad industry was "regulated pervasively" and had "long been a principal focus of regulatory concern." *Skinner*, 489 U.S. at 627–28, 109 S.Ct. 1402. By contrast, the trial record in this case contains no evidence indicating that the field of automotive repair is a similarly, pervasively regulated industry. The fact that this industry apparently does not present the kind of public safety concerns that would warrant regulatory oversight further confirms the Court's conclusion that the activities involved in these programs do not pose a significant safety risk. There is also no admissible evidence that shows these students are entering a field in which drug testing is the norm,[5] and so there is no basis for concluding that these students have diminished privacy expectations. *Cf. Barrett*, 705 F.3d at 323 ("[W]e think some college students that attend Linn State have a diminished expectation of privacy because they are seeking ac-

creditation in heavily regulated industries and industries where drug testing, in practice, is the norm.").

Finally, Defendants acknowledge that no faculty or staff at Linn State are drug tested as a condition of their participation in the Auto Body and Auto Mechanics programs. Yet they are the people most responsible for providing hands on training and feedback as well as enforcing safety rules and protecting their students from harm. If these programs posed a significant safety risk one would expect that all participants would be drug tested, not just the students.

In conclusion, the evidence shows that Defendants' asserted safety interest is, with respect to the Auto Body and Auto Mechanics programs, minimal if not nonexistent. The lack of a substantial and real public safety risk alone compels the conclusion that the drug-testing policy is unconstitutional as applied to these students. *See Chandler*, 520 U.S. at 323, 117 S.Ct. 1295. Furthermore, as discussed previously, Defendants made no attempt to shore up their assertion of a special need with evidence of drug use among Linn State's students and there is no evidence of even a single drug-related accident in Linn State's fifty-year history. In addition, these students' undiminished and therefore substantial privacy expectations as well as the somewhat heightened intrusiveness of the challenged drug-testing policy, due to the parental notification provision, further weigh against the reason-

---

**5.** Brandon did testify about the drug testing practices of the auto shops Linn State "deal[s] with on a regular basis." [Doc. # 92 at 104]. But the only foundation provided for this opinion is hearsay, specifically Brandon's conversations with members of the advisory board for these programs. *See* [Doc. # 92 at 104]. As Brandon was not testifying as an expert on drug testing in this field, this por-

tion of Brandon's testimony is inadmissible and therefore not part of the trial record. *See* Fed.R.Civ.P. 65(a)(2). Further, he gave no examples that would permit his conclusory statements to be tested or evaluated and given the evident administrative commitment to drug testing, bias cannot be ruled out. Therefore, even if the evidence were admissible, the Court does not find it persuasive.

ableness of the drug-testing policy as applied to the students in these programs. Accordingly, Defendants' unsubstantiated assertion of a special need does not outweigh the privacy interests of these students, and the Court finds that Linn State's drug-testing policy is unconstitutional as applied to students in the Auto Body and Auto Mechanics programs.

The evidence in the record regarding the Heavy Equipment Technology and Medium/Heavy Truck Technology programs similarly fails to demonstrate that these students perform the kinds of safety-sensitive tasks that might justify the drug-testing policy. The testimony of one instructor for these programs, Edward Frederick, is the only evidence in the record on this issue. As with the auto repair programs, much of Frederick's testimony on the safety risks involved with these programs is little more than a conclusory list of the equipment and materials these students use. Specifically, according to Frederick, these students use "[c]ommon hand tools," like hammers, chisels, wrenches, power tools and drills, and are exposed to chemicals like coolant and various cleaners. [Doc. # 92 at 86–87].

Absent any further context or explanation that might show how the students' use of these items presents a concrete danger of serious harm, which Defendants made no attempt to provide, the Court can only speculate as to whether these students engage in activities that pose significant safety risks. Once again, the items listed by Frederick appear to be of the type that might be found in any common household garage. Thus, for the same reasons discussed with respect to the auto repair programs, this evidence, without more, does not suggest that these students discharge duties so fraught with risk of injury to others that even a momentary lapse in attention could have disastrous consequences.

In addition, the credibility of Frederick's testimony is somewhat questionable, in light of one rather obvious attempt to exaggerate the dangers associated with these programs. Specifically, Frederick initially testified that these students "work with live electrical wiring," [Doc. # 92 at 87], but later admitted on cross-examination that they avoid working with live wiring "if at all possible," and that when they do work with live wiring it is to "attach[ ] a power tool," which means simply "[p]lugging [the tool] into an outlet," [Doc. # 92 at 92].

Furthermore, although these students diagnose and repair heavy machinery, as "a general rule" they do not operate this machinery, with the limited exception of moving it in and out of the shop area. [Doc. # 92 at 86–87]. While the Eighth Circuit found that the students in the Heavy Equipment Operations program discharge duties comparable to those considered in *Skinner, see Barrett,* 705 F.3d at 322, the students in that program actually "go off campus to build in communities," and "operate machinery on public roads," [Defendants' Exhibit 37]. By contrast, the safety risks associated with moving a piece of equipment a short distance, with an instructor in attendance, and for the sole purpose of bringing it into or out of a shop are fundamentally different, and necessarily less substantial, than the kind of public safety concerns that must be present to justify suspicionless drug testing. *Cf. Chandler,* 520 U.S. at 318, 323, 117 S.Ct. 1295; *Krieg,* 481 F.3d at 518 (finding that the plaintiff's occupation was "safety sensitive" where he operated the heavy equipment "in the City near other vehicles and pedestrians," as opposed to "in rural areas away from traffic and pedestrians"); *Burka,* 751 F.Supp. at 443 ("If

these employees operate vehicles on a regular basis in the presence of their fellow employees or the public, their task is safety sensitive. If their operation of motorized vehicles is only done on specific instructions of a supervisor in attendance, ... their task does not rise to the level of a safety sensitive occupation.").

In addition, as with the auto repair programs, there is evidence that these students are highly supervised and subject to a variety of faculty-enforced safety measures. Frederick testified that an "instructor and/or the lab assistant" supervises these students any time they are working on heavy equipment or using chemicals. [Doc. # 92 at 93]; *see also* [Plaintiffs' Exhibit 58, Pemberton Deposition Designations at 37:06–10]. Frederick also testified as to a number of general safety precautions utilized by these programs, including the mandatory use of personal protective equipment, such as face shields, safety glasses, and protective gloves. [Doc. # 92 at 91, 92]. The efficacy of faculty supervision and these safety precautions is evidenced by the fact that Frederick could recall only two minor injuries during his time as an instructor, and these were slight cuts or abrasions. [Doc. # 92 at 91]. Accordingly, any safety concerns that might be associated with using this equipment appear to be substantially mitigated by supervision and faculty-enforced safety procedures. *Cf. Burka*, 751 F.Supp. at 443–44 (finding that the positions of carpenter, mason, iron worker, plumber, sight maintainer, tinsmith, painter, sign painter, heating and air conditioning maintainer, and ventilation and drainage maintainer were not "safety sensitive" in part because these employees were subject to supervision).

Furthermore, there is no evidence from other schools or industry programs where significant injuries have occurred under similar supervised circumstances. Nor was there evidence of a Linn State student being so injured. This absence of evidence also persuades the Court that these programs are not safety sensitive. And the faculty who work in these programs are not drug tested. As previously discussed, if the work being done in these programs is inherently dangerous under these circumstances, one would expect the faculty to be drug tested as well.

Finally, there is no evidence that the students in the heavy equipment repair programs are entering heavily regulated fields, which suggests the safety risks associated with these industries do not present the type of significant public safety concerns that might demand regulatory oversight. There is, however, some evidence that students who work in these fields are tested by private employers. Specifically, Frederick testified that students in the Heavy Equipment Technician and Medium/Heavy Truck programs must complete internships for graduation and that "a large percentage" of these internships require drug testing. [Doc. # 92 at 88].

Even assuming that some or even all of these students have a diminished expectation of privacy, the drug-testing policy may not be constitutionally applied to them unless the activities required by their programs pose a substantial and real risk to public safety. *Chandler*, 520 U.S. at 323, 117 S.Ct. 1295 ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'... But where, ... public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."). Accordingly, the Court finds that Linn State's drug-testing policy is unconstitutional as applied to students in the Heavy Equipment Tech-

nology and Medium/Heavy Truck Technology programs.

The activities performed by students in the Power Sports and CAT Dealer Service Technician programs are similar to those discussed above, but differ in some crucial respects. The Power Sports students deal with on- and off-road motor vehicles, which requires the use of hydraulic and air type lifts. [Doc. # 92 at 96]. If these lifts are not properly locked, there is a possibility of injury or death. [Doc. # 92 at 96]. In addition, due to the unique kinds of vehicles which these students repair, this program uses a dynamometer, which is used to keep vehicles stationary while running them at a very high rate of speed. [Doc. # 92 at 96]. For instance, if a motorcycle is experiencing a problem at 120 miles per hour, the students will use the dynamometer to run the vehicle at this speed in order to try and find the problem. [Doc. # 92 at 96]. The use of this equipment necessarily requires a high degree of caution, as there is a constant risk that a tire could blow out or that parts could fly off. [Doc. # 92 at 96–97]. Furthermore, the students in this program routinely operate all of the vehicles with which they work, for test drives and other purposes. [Doc. # 92 at 97]. With respect to the CAT Dealer Service Technician program, these students are required to operate jib cranes, which are used to lift and move heavy equipment weighing up to 3,000 pounds. [Doc. # 92 at 89–90]; *see also* [Defendants' Exhibit 48]. While the students are moving heavy items around the shop using these cranes, other students are in close proximity and walking around on the floor of the shop. [Doc. # 92 at 89].

· Based on the unique and heightened safety risks associated with the Power Sports and CAT Dealer Service Technician programs, the Court finds that these programs, which are analogous to the Aviation Maintenance program, pose a significant safety risk even with faculty supervision. They are therefore similarly safety sensitive. Furthermore, the students in the Power Sports program are already subject to random drug testing, separate and apart from the challenged drug-testing policy. [Doc. # 92 at 99]. The fact that this program was specifically selected for random drug testing, while the other mobile equipment repair programs were not, further supports the conclusion that this program involves peculiar and comparatively significant safety concerns. Likewise, the students in the CAT Dealer Service Technician program must complete an internship in order to graduate and all of these internships require drug testing. [Doc. # 92 at 88].

As the students in both of these programs are already subject to suspicionless drug testing by virtue of their enrollment in these programs, these students have a diminished expectation of privacy. Accordingly, the Court finds that Linn State's drug-testing policy is constitutional as applied to students in the Power Sports and CAT Dealer Service Technician programs.

### C. Electronics Engineering Technology, Electrical Power Generation, and Heating, Ventilation and Air Conditioning

Defendants submitted very little evidence regarding whether students in the Electronics Engineering Technology and Electrical Power Generation programs perform tasks that present significant safety risks, either to the individual students themselves or to others. The only evidence of any safety risks associated with the Electronics Engineering Technology program consists of conclusory statements from the program's Department Chair, Vincel Geiger, who testified that

these students are "exposed to" electrical voltage of 120 volts or higher. [Doc. # 92 at 43, 44, 49–50]. With respect to the Electrical Power Generation program, the only evidence in the record is the testimony of this program's Department Chair, Anthony DeBoeuf, who testified that these students "are in close proximity with" high and low voltages, work "around moving engine parts," and are "exposed to" chemicals such as propane and gasoline. [Doc. # 42 at 95]. Neither witness provided any further context or explanation as to how or under what circumstances these students are exposed to high or low voltage or how this exposure presents a concrete danger to these students. Nor did DeBoeuf offer any further details about what engine parts the students work around or how working near these parts or handling ordinary gasoline presents a significant safety risk to these students. There also have not been any injuries in either program in the past five years, [Doc. # 92 at 48, 98–99], and there is no evidence in the record of any injuries that have been sustained by students in similar programs at other schools or by persons employed in these fields.

From this limited, perfunctory testimony, it is not at all clear that these programs pose the type of substantial and real safety concerns that are required to justify suspicionless drug testing. These witnesses' vague and unexplained statements to the effect that students are "exposed to" or "in close proximity with" live voltage or wiring are, without more, particularly unpersuasive, as one defense witness clarified that exposure to live wiring may, in fact, amount to nothing more than plugging something into an outlet, [Doc. # 92 at 92]. In other words, a live wire is simply a wire through which electricity passes, such as a cord plugged into an outlet. This illustrates how abstract and esoteric statements about exposure to elec-tricity, like those provided by Geiger and DeBoeuf, can be highly misleading. After all, at this level of abstraction, any office worker who plugs in a computer is thereby "exposed to" live voltage. But certainly this would not justify subjecting this employee to a suspicionless drug test.

The testimony of Geiger and DeBoeuf only permits speculation about how this undefined "exposure" or "proximity" might, theoretically, present a safety risk to these students and is therefore insufficient. Without any further explanation, it is not possible to determine whether the possibility of any injury that could be imagined is real or purely hypothetical. *Cf. Chandler,* 520 U.S. at 319, 117 S.Ct. 1295 ("Nothing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical . . . ."). Of course, the absence of any evidence of injuries in these programs, in similar programs at other schools, or even in these fields further supports the Court's conclusion that there are no special or unique safety issues in these programs.

DeBoeuf's conclusory statements regarding the presence of moving engine parts and chemicals like propane are deficient for the same reason. Furthermore, it is hard to see how any dangers that might even be inferred from a student's proximity to a moving fan belt or exposure to ordinary gasoline, [Doc. # 92 at 95], could be considered analogous to the risks associated with taxiing an airplane on an active runway, *Barrett,* 705 F.3d at 319, or operating a freight train, *Skinner,* 489 U.S. at 620, 109 S.Ct. 1402. The same conclusion is necessary with respect to DeBoeuf's testimony that, in compliance with the Electrical Power Generation program's safety policy, students use a hoist to lift objects weighing 150 pounds or more. There is no evidence as to how or under what circumstances this hoist is used or

how it is operated. There is also no indication as to how or even if misuse of this hoist poses a substantial and immediate safety risk. Presumably, there might be a concern that a heavy item could fall, but there is no evidence as to whether it is even possible for an item to be sufficiently controlled by the hoist to be lifted, yet unstable enough to fall. Nor is there evidence as to whether some inadvertent action could cause a loaded hoist to suddenly drop a heavy item. Nor do we know whether students are in close proximity to the hoist while an item is lifted, where they stand to operate the hoist, or even how high the hoist lifts the objects it carries. Accordingly, it is not possible to find that this equipment poses a significant safety risk without resort to speculation.

In addition, the fact that these students work in a lab setting, [Doc. # 92 at 43], and under the supervision of faculty, [Doc. # 92 at 99]; *see also* [Plaintiffs' Exhibit 58, Pemberton Deposition Designations at 37:06–10], further mitigates any safety risks that might be present in these programs. For instance, DeBoeuf testified about a variety of safety protocols used in the Electrical Power Generation program. [Doc. # 92 at 95–96, 98]. Thus, although these students use a hoist to lift heavy objects, [Doc. # 92 at 95–96], any safety risks attendant to this task are substantially mitigated by supervision and faculty-enforced safety procedures. *Cf. Harmon,* 878 F.2d at 491. The fact that there is no evidence of any injury that has ever been sustained in these programs, though not dispositive, either shows that supervision and safety precautions are effective, or suggests that these programs do not involve particularly safety-sensitive activities.

The evidence presented is even more deficient with respect to whether the students in these programs perform tasks that pose a significant safety risk to others. Neither Geiger nor DeBoeuf ever testified as to how any of the safety concerns they identified poses a risk to others, as opposed to only the individual student. A review of the record as a whole reveals only one potential risk to others that might be involved in these programs, which arises from the fact that these students are, at some point, exposed to "live" voltages. As to how a student's proximity to live voltage could result in injury to someone else, the Department Chair of the Heating, Ventilation and Air Conditioning program, Benjamin Berhorst, suggested that, if a student comes into contact with live voltage while also physically touching another person and at a time when the student "happen[s] to be the thing closing the circuit to the ground," then the person the student is touching could be injured. [Doc. # 92 at 54–55]. There is no evidence, however, of such an accident actually occurring at Linn State, at any other school, or out in the field. There is also no other evidence regarding the likelihood of such an incident.

Pure speculation about a single, hypothetical sequence of events cannot suffice to justify suspicionless drug testing. In even the safest circumstances, it is possible to surmise some series of events that could, theoretically, result in injury to others. But if boundless speculation could provide the requisite special need for drug testing, it would render meaningless the Supreme Court's instruction that the asserted safety interest must be "substantial and real" in order for suspicionless drug testing to fall within the "closely guarded category" of constitutional, suspicionless searches. *Chandler,* 520 U.S. at 308–309, 323, 117 S.Ct. 1295; *see also Little Rock Sch. Dist.,* 380 F.3d at 356–57 (holding that "a mere apprehension" or a "mere assertion" of a special need is not sufficient to justify a suspicionless search); *Lebron,* 710

F.3d at 1213 ("[T]he Supreme Court has required that a state must present adequate factual support that there exists a 'concrete danger,' not simply conjecture .... " (quoting *Chandler*, 520 U.S. at 319, 117 S.Ct. 1295)). Accordingly, the Court cannot find that a solitary, entirely hypothetical risk can justify Linn State's drug-testing policy with respect to these students. *Cf. Chandler*, 520 U.S. at 319, 117 S.Ct. 1295 ("Nothing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical.... ").

Moreover, as discussed previously, Defendants did not attempt to shore up their asserted special need with evidence of drug use among Linn State's students and there is no evidence of even a single drug-related accident in Linn State's fifty-year history. In addition, there is no evidence that the students in these programs are entering heavily regulated industries, which also suggests that these programs are not safety-sensitive, as the activities performed by individuals in these fields apparently do not present the type of substantial safety concerns that would warrant regulatory oversight. With respect to the Electrical Power Generation program, there is also no evidence that these students are entering a field in which drug testing is, in practice, the norm. Regarding the Electronics Engineering Technology program, Geiger did testify that it "would be typical" for employers in this field to require drug testing prior to employment, [Doc. # 92 at 46–47]. However, even assuming that these students have a diminished expectation of privacy, the drug-testing policy cannot constitutionally be applied to them in the absence of a substantial and real safety concern. *See Chandler*, 520 U.S. at 323, 117 S.Ct. 1295. For the reasons discussed above, the evidence wholly fails to demonstrate the existence of such a need with respect to these programs. Accordingly, the Court finds that Linn State's drug-testing is unconstitutional as applied to the students in the Electronics Engineering Technology and Electrical Power Generation programs.

With respect to the Heating, Ventilation and Air Conditioning program, there is evidence of one additional safety risk to others that is unique to this program, but the Court finds this risk is not significant, given Linn State's supervisory control. Specifically, these students work on live gas lines, which, if not reassembled correctly, could result in a gas leak. [Doc. # 92 at 55]. Considering the "constant supervision" provided by Linn State's faculty, [Doc. # 92 at 57], however, it seems implausible that such a serious mistake could be overlooked by the instructors in this program. As a result, this risk is substantially mitigated by the specific context in which these activities are performed, which distinguishes this safety concern from those that might warrant suspicionless testing. *Cf. Harmon*, 878 F.2d at 491 ("The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs."); *Burka*, 751 F.Supp. at 444 (finding that "Heating and Air Conditioning Maintainers" and "Ventilation and Drainage Maintainers" were not safety sensitive positions because the employees were subject to supervision).

Accordingly, the Court finds that Linn State's drug-testing policy is unconstitutional as applied to students in the Heating, Ventilation and Air Conditioning program.

### D. Commercial Turf and Grounds Management and Machine Tool Technology

With respect to the Commercial Turf and Grounds Management and Machine Tool Technology programs, the evidence in the record consists of little more than a conclusory list of the equipment and materials students in this program are exposed to. Specifically, the Department Chair of the Commercial Turf and Grounds Management program averred that students in this program "are exposed to forklifts, mowers, power washers, oil drums, angle grinders, vise grips, fuse boxes, tractors, mini-excavators, flammable materials, equipment lifts, UTVs, impact drivers, pliers, hacksaws, cooling system pressure testers, propane torches, welders, plasma cutters, power saws, concrete saws, pruning saws and hedge trimmers among other dangerous items." [Defendants' Exhibit 41]. At trial, Dr. Pemberton added that these students work with large commercial mowers as well as the kinds of small mowers used by common households. They also use skid steers, which are commonly referred to as bob cats and are used to move materials like mulch or soil. According to Dr. Pemberton, these students do some landscaping and spray chemicals, which they do not mix. The Department Chair of the Machine Tool Technology program averred that students in this program "are exposed to manual milling and lathe machines, horizontal and vertical saws, drill presses, heat treatment furnaces, computer control lathes and milling machines, pedestal grinders, surface grinders, tool grinders, 35 ton punch presses, 75–ton plastic injection molding presses, flammable products and dangerous chemicals." [Defendants' Exhibit 38].

Again, these conclusory descriptions might invoke the imagination, but speculation is not permissible, particularly when a constitutional protection is at issue. Absent some further description of what the various items that are mentioned are or the circumstances in which they are used, the Court cannot conclude that these students " 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences,' " *Barrett,* 705 F.3d at 322 (quoting *Skinner,* 489 U.S. at 628, 109 S.Ct. 1402). In addition, there is no evidence of injuries at Linn State or elsewhere when these machines are being used, suggesting that proper supervision can address any safety risks.

Furthermore, there is no evidence in the trial record that suggests students in these programs are entering heavily regulated industries or industries in which drug testing is, in practice, the norm. As a result, there is no basis for finding that these students have a diminished expectation of privacy. *Cf. id.* at 323, and the Court finds that the drug-testing policy is unconstitutional as applied to students in the Commercial Turf and Grounds Management and Machine Tool Technology programs.

### E. Computer Programming, Construction and Civil Technology, Networking Systems Technology, and Design Drafting

Defendants produced some evidence regarding the Computer Programming, Construction and Civil Technology, and Networking Systems Technology programs, but this evidence does not show that students in these programs engage in safety-sensitive activities. The only evidence before the Court with respect to each of these programs is a one-page affidavit from the department chair. With respect to Computer Programming, the relevant affidavit contains only three sentences regarding the activities performed by students in this program. Specifically,

the affidavit states that students in the "networking and telecommunications sections" of this program "work on electrical components using 110 volts. They set up computer networks, and build computer cables, among other tasks." [Defendants' Exhibit 34]. This affidavit further provides that the computers the students work with may have voltage or amperage buildup, which the affiant considers "very dangerous," but does not explain why. [Defendants' Exhibit 34]. Regarding Construction and Civil Technology, the relevant affidavit contains only a single, cursory sentence regarding the activities performed by students enrolled in this program. Specifically, the affidavit declares that students in this program "will learn surveying and materials testing, which uses concrete crushers and ovens among other dangerous items." [Defendants' Exhibit 39]. Finally, with respect to the Networking Systems Technology program, the relevant affidavit states that students in this program "work with fiber optics, digital switches, voice-overs, wireless and AC/DC power distribution converted by a rectifier. They also splice cables, and work with sharp hand tools among other dangerous items." [Defendants' Exhibit 40].

This evidence wholly fails to suggest that the activities performed by students in these programs pose any safety risks to others. Students in Computer Programming work with computer components that use no more voltage than that used by an ordinary, household computer. Furthermore, assembling computer components in a lab setting under the supervision of an instructor, splicing cables, and working with hand tools do not give rise to the type of concrete dangers required to justify a suspicionless search. *Compare Chandler*, 520 U.S. at 318, 323, 117 S.Ct. 1295 ("Notably lacking . . . is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule. . . . [W]here . . . public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."), *with Skinner*, 489 U.S. at 628, 109 S.Ct. 1402 ("Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."). If working with a sharp hand tool presented the type of danger deemed sufficient to justify a search, then any office clerk who uses sharp objects could be subject to a suspicionless drug test. *Cf. Von Raab*, 489 U.S. at 678, 109 S.Ct. 1384 (assuming that positions such as "Accountant," "Electric Equipment Repairer," and "Mail Clerk/Assistant" could not be subjected to suspicionless testing based on an asserted safety interest). To the extent that each of these affidavits simply asserts that students work with dangerous items, without providing any context or further elaboration as to what the items are or how they are used, this evidence is insufficient to justify the significant privacy expectations intruded on by the challenged drug-testing policy, particularly because there is no evidence of any injury in Linn State's programs or injuries in similar programs at other schools or in an IT department anywhere. *Cf. Little Rock Sch. Dist.*, 380 F.3d at 357 (finding that the "mere assertion" of a special need could not justify the suspicionless search at issue).

With respect to the Design Drafting program, the department chair of this program, Aaron Kliethermes, testified at the preliminary injunction hearing that students in this program spend about 61 % of their time in the lab. [Doc. # 92 at 61]. Kliethermes provided the following description of the typical lab courses taken by students in this program. "They do

manual drafting on a drafting board. They use pencil and paper, and they use manual drafting tools to create drawings in the mechanical field. And then the other one is computer-aided drafting on computer software in the computer lab set up for about 20 students." [Doc. # 92 at 61]. In addition, drafting students assemble a small teaching aid, about the size of a desk, *see* [Defendants' Exhibit 45], to better understand how steel columns and beams are connected together. [Doc. # 92 at 62].

Kliethermes also described a portion of the drafting program during which students travel to and inspect construction sites:

> Some of the job sites that we do go through and take them to, they do require hard hats, they do require some safety glasses in some of the areas. We go to them, we just visit, we look—we talk to the engineer, we look at the plans to make sure, you know, we understand what they're talking about and we actually see the building or the bridge or whatever, the design is going up.

[Doc. # 92 at 63]. Asked whether the students went out onto an unfinished bridge during one of these site visits, Kliethermes responded, "We actually stood at the end of the bridge, but we actually walked around uneven ground because the approaches and deproaches (sic) were not done." [Doc. # 92 at 64].

In addition, Kliethermes testified that students in a second-year architectural class in this program design a structure and that most of these designs are ultimately built. [Doc. # 92 at 65]. But Kliethermes also testified that when a student produces a design drawing, "we actually go through and have somebody else look at it before it's built." [Doc. # 92 at 68]. According to Kliethermes, the only way a drafting student's design could be built without instructors or professionals reviewing it first would be for the student to go out and build it on her own. [Doc. # 92 at 68]. Kliethermes could not recall a single instance of "a student actually building something," and even if they did it would not be part of Linn State's program. [Doc. # 92 at 68]. Surely hypothetical considerations about what students might choose to do on their own time outside of class cannot provide a special need that justifies mandatory suspicionless drug testing. Otherwise, concern that an impaired student might drive a car on her way to class would seemingly provide the requisite special need to justify such a testing program. *Cf. Scott,* 717 F.3d at 877 (rejecting the government's claim that suspicionless drug testing was justified by the danger posed by an employee "driving a car in the workplace parking").

This testimony fails to show that students in the Design Drafting program engage in any activities that pose significant safety risks. To the extent that this program involves any safety risks at all, they appear limited to the possibility that a student might accidentally trip and fall while navigating uneven ground during a site visit. But the risk of stumbling in this manner cannot be compared to the kind of "concrete danger" that may "demand[ ] departure from the Fourth Amendment's main rule," *Chandler,* 520 U.S. at 306, 117 S.Ct. 1295, such as those presented in *Skinner* and *Von Raab. Cf. Scott,* 717 F.3d at 877 ("We reject the idea that a stack of heavy boxes or a wet floor falls within the same ballpark of risk as the operation of a ten-thousand-ton freight train or the danger posed by a person carrying a firearm.").

Furthermore, as discussed at length above, the special need identified by the Eighth Circuit Court of Appeals is concern over drug use by students "in programs

posing significant safety risks *to others.*" *Barrett,* 705 F.3d at 322 (emphasis added). Other than Mr. Kliethermes' purely speculative suggestion that a student might somehow go about self-constructing a design that was not reviewed by a teacher or other professional, there is no evidence that drafting students ever engage in activities that pose a safety risk to others.

### F. Linn State's drug-testing policy is unconstitutional as applied to students enrolled in programs for which there is no evidence

Defendants' response to Plaintiffs' request for admission indicates that Linn State offers at least twenty-eight distinct academic programs. [Plaintiffs' Exhibit 59 at 1]. Yet, the trial record only contains evidence regarding, at most, twenty of Linn State's programs. Accordingly, there are some programs for which Defendants have offered no evidence to support their asserted special need. With respect to these programs, Defendants have not satisfied their burden of production and the drug-testing policy must be found unconstitutional as applied to the students in these programs.

This is true even though students who are not enrolled in safety-sensitive programs are on a campus in proximity to some students engaged in safety-sensitive activities. As evidence of proximity, Dr. Pemberton testified that students in the Design Drafting program attend class in the same building and one floor above students who are learning welding and that there is a solar panel on campus that sits next to a sidewalk. [Doc. # 92 at 120, 152]. The Court cannot find that simply attending class in the same building as students who are learning welding or walking past a solar panel present the type of substantial and real safety risks that are required to justify a suspicionless search.

*See Chandler,* 520 U.S. at 323, 117 S.Ct. 1295.

Thus, with respect to the unidentified programs, Defendants have failed to meet their burden of production. *See Der,* 666 F.3d at 1128–29. Accordingly, the Court finds that the drug-testing policy is unconstitutional as applied to students in any program not specifically identified in this Order.

### G. Neither the evidence of cross-enrollment nor the optional petition process makes the drug-testing policy constitutional as applied to all Plaintiffs

Effectively conceding that not all of the programs offered at Linn State involve safety-sensitive activities, Defendants argue that the drug-testing policy is nonetheless constitutional as applied to all Plaintiffs based on two distinct theories. Each of these claims is addressed in turn.

#### 1. Cross-enrollment

■ Defendants argue that it is reasonable under the Fourth Amendment to drug test even those students who are not enrolled in safety-sensitive programs due to the possibility of cross-enrollment. This claim is based on the fact that students at Linn State are permitted to take courses outside of their designated programs. Under this theory, students enrolled in non-dangerous programs may still be tested because it is possible that these students will elect to take courses in other programs that include tasks that pose a significant safety risk to others.

Based on the evidence in the trial record, however, this concern is too abstract and unsubstantiated to constitute the kind of significant and concrete danger required to override the ordinary requirements of the Fourth Amendment. *See Chandler,* 520 U.S. at 323, 117 S.Ct. 1295; *Lebron,* 710 F.3d at 1213; *Little Rock Sch. Dist.,*

380 F.3d at 356–57. Some Linn State faculty members did testify about cross-enrollment during the preliminary injunction hearing, but this testimony was largely limited to conclusory statements that students do, sometimes, take classes outside of their chosen program. [Doc. # 92 at 106, 108] and [Doc. # 92 at 97]. This testimony is largely irrelevant to Defendants' cross-enrollment theory, because only one specific type of cross-enrollment could potentially justify drug testing a student enrolled in a non-dangerous program. In particular, students would have to enroll in a class outside their program that poses a significant safety risk to others. A thorough review of the trial record, however, does not reveal even a single, demonstrated instance of this occurring.

An instructor in the Industrial Electricity program did testify that students from other programs "occasionally" take his classes, but only "[i]f it's something that's not an upper level class." [Doc. # 92 at 106, 108]. Similarly, an instructor for the Electrical Power Generation and Power Sports programs testified that students enrolled in other programs may take some of his classes. [Doc. # 92 at 97]. But this testimony only shows that cross-enrollment into these programs[6] happens, not that a student from a non-safety sensitive program has enrolled in safety sensitive class. In fact, there is no evidence in the record identifying those classes within each program that even involve safety sensitive activities. Further, it is unlikely that it is the lower level classes that are safety sensitive rather than the upper division classes.

In short, Defendants' cross-enrollment theory is, on this record, entirely speculative. Accordingly, the Court cannot find that the entire student population may be subjected to a suspicionless search on this wholly hypothetical basis. *See Chandler*, 520 U.S. at 323, 117 S.Ct. 1295; *Little Rock Sch. Dist.*, 380 F.3d at 356–57.

The other evidence regarding cross-enrollment is irrelevant, because it pertains solely to students from non-dangerous programs taking courses in other, non-dangerous programs. Diane Heckemeyer, the Department Chair of the Construction and Civil Technology program, averred that six students in this program were dual-enrolled in the Design Drafting Technology program. [Defendants' Exhibit 39]. Likewise, Vincel Geiger, the Department Chair of the Electronics Engineering Technology program, testified that students from other programs can take courses in this program "if they meet the requirements, the prerequisites." [Doc. # 92 at 45]. As explained above, however, Defendants cannot constitutionally subject students in any of these programs to suspicionless testing. Finally, Aaron Kliethermes, the Department Chair of the Design Drafting Technology program, testified that one student in this program was taking a welding class and that another was trying to get into a machine tool class. [Doc. # 92 at 65]. But Defendants failed to meet their burden of production with respect to welding and, for the reasons discussed above, students in the Machine Tool program cannot constitutionally be subjected to the drug-testing policy.

In conclusion, Defendants have not produced any evidence showing that even a single student enrolled in a non-dangerous program has ever actually cross-enrolled into a class in another program that involves safety-sensitive activities. Furthermore, if the mere possibility of

---

**6.** For the reasons discussed previously, students in the Industrial Electricity and Power Sports programs may constitutionally be subjected to the drug-testing policy, although students in the Electrical Power Generation program may not.

cross-enrollment was sufficient to justify mandatory, suspicionless drug testing, then seemingly every public university in the country could constitutionally adopt such a policy. Nearly every college could likely identify a course or courses that entail some work that poses a safety risk to others. Considering the frequency with which college students change their majors, these schools might plausibly claim that every incoming student could potentially enroll in such a safety-sensitive class.

As the Eleventh Circuit persuasively reasoned in *Scott,* if generalized and indefinite safety concerns "sufficed to justify suspicionless drug testing, then the exception would swallow the rule and render meaningless *Von Raab's* distinction between those employees for whom physical fitness, mental sharpness, and dexterity are paramount and 'government employees in general.'" *Scott,* 717 F.3d at 877 (quoting *Von Raab,* 489 U.S. at 672, 109 S.Ct. 1384). Accordingly, the Court cannot find that Defendants have presented evidence of a substantial special need with respect to every Linn State student based on an unsubstantiated apprehension of possible cross enrollment.

### 2. The optional petition process

■ Defendants alternatively argue that, even if the drug-testing policy has some unconstitutional applications, it may still be upheld in its entirety because the policy includes a process by which students can petition Linn State's President for an exemption from the drug-testing policy. Defendants maintain that it is reasonable under the Fourth Amendment

to place the burden on each individual student to produce evidence that he or she is not enrolled in a program that implicates the special need on which Defendants rely to justify the search. According to Defendants, their drug-testing policy is presumptively reasonable unless a student petitions for an objection and "provides [Defendants] with the information necessary to determine whether exclusion is warranted."[7] [Doc. #233 at 2]. Under this theory, any state actor could impose a mandatory, suspicionless search on a broad population and the search would be presumptively reasonable as long as the targets of the search were allowed to make a discretionary appeal for an exemption to the actor conducting the search. In this scenario, the burden would, in effect, be on the targets of the search to show the absence of a special need that justifies the search.

Defendants' position thus impermissibly shifts the burdens of the parties in cases involving suspicionless searches. The Court is not aware of, and Defendants have not cited, any authority that supports the proposition that individuals can be required to "optin" to their constitutional rights in this manner. In fact, controlling Eighth Circuit precedent makes clear that Defendants have the burden of producing evidence of the exceptional circumstances that justify this suspicionless, and therefore otherwise unlawful, search. *See Der,* 666 F.3d at 1128–29. It would be directly contrary to this precedent to require the students to either submit to unconstitutional applications of the drug-testing poli-

---

7. This is particularly evident in Defendants' post-trial brief, wherein Defendants state that Linn State's drug-testing policy "adopt[s] what is essentially *a presumption* that all students at the college are enrolled in or participating in safety sensitive classes or activities." [Doc. #233 at 2] (emphasis added). Similar-

ly, Dr. Pemberton testified at the preliminary injunction hearing that a student may be excused from the drug testing if he or she could "demonstrate[ ]," through the petition process, that testing him or her would violate the Constitution. [Doc. #92 at 152].

cy or present evidence that there is no special need that justifies the search. Furthermore, to adopt such a rule would "require plaintiffs to do the impossible: to speculate as to all possible reasons justifying the policy they are challenging and then to prove a negative—that is, prove that the government had no special needs when it enacted its drug testing policy." *Scott,* 717 F.3d at 882.

Defendants' position is all the more untenable considering that knowledge of the particular safety-risks involved in any given program is uniquely within Defendants' possession. Defendants are certainly more aware of the activities engaged in by students who are enrolled in Linn State's various programs than an incoming student, who could at best speculate, based on hearsay and generic course descriptions, whether a given program requires activities that pose a significant safety risk to others. In addition, it is not at all clear whether the students who were tested in September of 2011 were even aware of the option of petitioning for an exemption. The drug testing procedures that established the petition process were not signed by Dr. Claycomb until September 6, 2011—the day before the testing began. *See* [Plaintiffs' Exhibits 16, 59 at 9]. Furthermore, the "Student Drug Screening Information" form, the acknowledgment form signed by the students, and the list of frequently asked questions about the testing policy stated only that failure to participate in the drug testing would result in administrative or student-initiated withdrawal. [Plaintiffs' Exhibits, 8, 15, 54]; [Doc. # 92 at 27–28, 33]; *see also* [Plaintiffs' Exhibit 58, Pemberton Deposition Designations at 89:05–17]. None of these documents mentioned the opportunity to petition to be excused from the testing. Nor does the drug-testing policy articulate any clear standards by which a petition to be excused from testing would be evaluat-

ed. When Dr. Claycomb testified at the preliminary injunction hearing, he could not identify any specific factors that would guide his decision on a petition for an exemption. *See* [Doc. # 92 at 36–37]. Yet, Dr. Pemberton testified that Dr. Claycomb is the "only stop," with respect to whether a petition for an exemption would be granted or denied. [Plaintiffs' Exhibit 58, Pemberton Deposition Designations at 92:24–93:09].

In any case, there is certainly no evidence that students were informed that they could petition for an exemption based on the relative lack of safety risks involved in the program in which they were enrolled. In fact, safety is hardly mentioned in the rationales and program goals adopted by the Board of Regents. *See* [Plaintiffs' Exhibit 4]. Nor does safety figure prominently into the frequently asked questions distributed to the students. *See* [Plaintiffs' Exhibit 8]. Nonetheless, Defendants suggest that these students, of their own volition and with limited if any knowledge of Fourth Amendment law, can reasonably be expected to file a petition for an exemption from the drug-testing policy on the ground that they are not enrolled in a safety-sensitive program. As unreasonable as this proposition may be in isolation, it is all the more so in light of the fact that Defendants, prior to the students being drug tested, will know the exact program in which every student is enrolled, *see* [Plaintiffs' Exhibit 21], and possess vastly superior information regarding the safety risks involved in the various programs offered at Linn State.

## VII. The Appropriate Relief

Plaintiffs' Second Amended Complaint requests: 1) a declaratory judgment finding Defendants' drug-testing policy unconstitutional on its face or as applied; 2) a permanent injunction preventing the de-

privation of Plaintiffs' constitutional rights, precluding Defendants from imposing a fee for any unconstitutional drug tests, requiring Defendants to credit any fees already assessed for instances of unconstitutional testing, and ordering Defendants to destroy all urine samples that were unconstitutionally collected; and 3) an award of costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988. [Doc. # 180 at 9]. Each of these requests is addressed in turn, below.[8]

### A. Plaintiffs are entitled only to as-applied relief

Plaintiffs argue that a declaratory judgment finding the drug-testing policy facially unconstitutional is appropriate. This argument cannot succeed, however, in light of the Eighth Circuit's decision on the interlocutory appeal in this case as well as the Eleventh Circuit's decision in *Scott.* On appeal, the Eighth Circuit held that, for Plaintiffs to succeed on their facial challenge, they must show that "no set of circumstances exists" in which the drug-testing would be valid. *Barrett,* 705 F.3d

at 321 (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Put differently, Plaintiffs' facial challenge must fail unless the challenged drug-testing policy is unconstitutional "in every conceivable circumstance." *Id.* at 324.

Nonetheless, Plaintiffs argue that the *Salerno* standard relied on by the Eighth Circuit Court of Appeals should be interpreted differently than it was. But Plaintiffs also concede, as they must, that the Court is bound by the law of the case. Plaintiffs' alternative argument relies on a strained interpretation of the no set of circumstances test. Specifically, Plaintiffs claim that there is no set of circumstances under which Defendants can require every Linn State student to submit to suspicionless drug-testing. An identical argument was considered and rejected by the Eleventh Circuit in *Scott.* In that case, the plaintiff argued that the challenged drug-testing policy applied to "all employees, and 'there are no circumstances in which suspicionless drug testing of all employees and applicants would be constitutional.'"

**8.** Defendants' Answer to Plaintiffs' Amended Complaint includes a number of affirmative defenses. [Doc. # 216 at 7–8]. But Defendants did not rely on or even mention these defenses at trial, have never cited any legal authority, presented any argument or submitted any evidence in support of these defenses, and failed to respond to Plaintiffs' arguments as to why each affirmative defense must fail. Accordingly, Defendants have abandoned these affirmative defenses. *See Sherman v. Winco Fireworks, Inc.,* 532 F.3d 709, 721 (8th Cir.2008) (affirming the district court's decision denying a request for a jury instruction related to contributory negligence where contributory negligence had been pled, "[b]ut by the time of trial, that affirmative defense was apparently abandoned."); *In re Mamtek US, Inc.,* No. 11–22092, 2013 WL 4602657, at *9 n. 36 (Bankr.W.D.Mo. Aug. 29, 2013) ("The affirmative defenses are issues on which the Defendant would bear the burden of proof.... As a result of his failure to brief and

argue the defenses ... Defendant has effectively abandoned them."); *Ozarks Coca-Cola/Dr Pepper Bottling Co. v. Ritter,* No. 10–3067–CV–S–RED, 2011 WL 2491577, at *6 (W.D.Mo. June 22, 2011) ("In its suggestions in support, Ozarks discussed why each of the Ritters' ten affirmative defenses failed. In responding, the Ritters only addressed the first, second and ninth defenses. Therefore, the Ritters have abandoned their other affirmative defenses."); *E.E.O.C. v. Rath Packing Co.,* No. CIV. 77–57–D, 1979 WL 1566, at *4 (S.D.Iowa Sept. 12, 1979) ("The Court is of the opinion that this affirmative defense was, if not specifically abandoned, abandoned in effect by failure to urge it at appropriate times during the course of these proceedings."). To the extent Defendants suggest in their Answer that the Court lacks subject matter jurisdiction over this dispute, this case clearly raises a federal question and so jurisdiction is provided by 28 U.S.C. § 1331.

*Scott,* 717 F.3d at 871. The *Scott* court reasoned persuasively that this misapplied the *Salerno* test because, under this theory, a single unconstitutional application of the challenged act would make the entire act unconstitutional. *Id.* The court found that this "inverts *Salerno* and renders a facial attack, far from being the most difficult of challenges, ... the easiest to make." *Id.* Because the drug testing in that case "could not possibly be unconstitutional as to all [of the persons subject to the testing]," the *Scott* court held that the plaintiff had failed to show that the drug-testing policy was facially unconstitutional. *Id.* at 869–71.

Similarly, in this case the Court has found that the challenged drug-testing policy is constitutional as applied to some students at Linn State. Consequently, Plaintiffs have failed to show that the challenged drug-testing policy is unconstitutional "in every conceivable circumstance." *Barrett,* 705 F.3d at 321, 324.

At the same time, Defendants, in arguing that Plaintiffs are not entitled to as-applied relief because they requested facial relief, confuse the breadth of the appropriate remedy with what must be pleaded in the complaint. On this issue, the Supreme Court has explained:

> [T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction ... goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.

*Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Relying in part on this language from *Citizens United,* the *Scott* court rejected a claim that is identical to the one asserted by Defendants in this case. In *Scott,* the defendant argued "that the district court could not have construed the [plaintiff's] suit as an as-applied challenge at all because the [ ] complaint requested only facial relief." *Scott,* 717 F.3d at 863. In addition to the Supreme Court's instruction in *Citizens United,* the *Scott* court found this claim "unconvincing" due to the fact that facial challenges are generally disfavored, which leads courts to "construe a plaintiff's challenge, if possible, to be as-applied." *Id.* at 864; *see also Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force,...").

In this case, Defendants' argument has even less merit, as Plaintiffs properly sought and were granted leave to file an amended complaint that specifically requests as-applied relief. *See* [Docs. ## 175; 179; 180].

## B. The permanent injunction

■ A party is entitled to a permanent injunction only if it proves: "(1) its actual success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest." *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church,* 634 F.3d 1005, 1012 (8th Cir.2011). This standard is "essentially the same as for a preliminary injunction," except that, at this stage, the movant is required to show actual success on the merits. *Bank One, Utah v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999).

As set forth above, Defendants' drug-testing policy is unconstitutional as applied

to students enrolled in certain programs at Linn State. Accordingly, the students who were enrolled in these programs in September of 2011 as well as those students who may enroll in these programs in the future have proven actual success on the merits of their constitutional challenge. Consequently, a permanent injunction will issue with respect to these students and these programs if the other elements are satisfied.

Defendants concede, as they must, that any Plaintiffs who prove a constitutional violation have also met the irreparable harm requirement. Furthermore, it is clear that this harm outweighs any possible harm to others. First, any students enrolled in programs posing a significant safety risk to others will be expressly excluded from the preliminary injunction. Second, the other drug-testing policies applicable to Linn State students—including the suspicionless testing of students who participate in internships where private entities mandate drug testing, the suspicionless testing of students enrolled in the Heavy Equipment Operations and Commercial Driver's License programs, and the suspicion-based testing of students provided for in Linn State's rules and regulations—will not be affected by the injunction. Third, prior to the adoption of the challenged policy, Linn State operated for fifty years without a single accident attributable to drug use. For these reasons, the Court finds that the irreparable harm to Plaintiffs outweighs any possible harm to others.

Finally, the protection of constitutionally protected rights necessarily serves the public interest. *Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008) ("[I]t is always in the public interest to protect constitutional rights."), *overruled on other grounds by Phelps–Roper v. City of Manchester, Mo.,* 697 F.3d 678 (8th Cir.2012).

Consequently, the Court finds that a permanent injunction is warranted with respect to those Plaintiffs whose Fourth Amendment rights were, or would be, violated by the application of Defendants' drug-testing policy.

Plaintiffs also request that, as part of this injunction, Defendants be ordered to return the $50.00 fee assessed for any instance of unconstitutional testing. Defendants did not respond to Plaintiffs request or arguments for this relief. Although Plaintiffs previously withdrew their request for damages, the return of these fees does not constitute "damages" or "money damages" as that term is properly understood. On this point, the Supreme Court has explained:

> [T]he term "damages" refers to money awarded as reparation for injury resulting from breach of legal duty.... Thus the phrase "money damages" ... refers to one of the two broad categories of judicial relief in the common-law system. The other, of course, is denominated "specific relief." Whereas damages compensate the plaintiff for a loss, specific relief prevents or undoes the loss— for example, by ordering return to the plaintiff of the precise property that has been wrongfully taken, or by enjoining acts that would damage the plaintiff's person or property.

*Bowen v. Massachusetts,* 487 U.S. 879, 913–14, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (citations omitted). Consequently, although Plaintiffs are entitled only to equitable relief, the Court finds it appropriate, as a part of that remedy, to order the return of those fees collected by Defendants in connection with the unconstitutional applications of Defendants' drug-testing policy.

### C. Costs and reasonable attorney's fees

Plaintiffs request an award of costs and reasonable attorney's fees, as authorized

by 42 U.S.C. § 1988(b). As Plaintiffs are the prevailing party in this litigation, Plaintiffs may file the appropriate motions for attorney's fees and costs within fourteen (14) days of the entry of this judgment.

## VIII. Conclusion

For the reasons set forth above, the Court hereby finds and orders as follows:

1. Linn State's drug-testing policy is unconstitutional as applied to all Plaintiffs who were not, are not, or will not be enrolled in the Aviation Maintenance, Electrical Distribution Systems, Industrial Electricity, Power Sports, and CAT Dealer Service Technician programs.

2. It is hereby ORDERED that Defendants, their successors, officers, agents, servants, employees, attorneys, and all persons acting in concert with them or in connection with them are hereby prohibited from conducting, pursuant to the challenged drug-testing policy, any further collection, testing, or reporting the results of any testing of urine specimens from any Plaintiffs who were not, are not, or will not be enrolled in the Aviation Maintenance, Electrical Distribution Systems, Industrial Electricity, Power Sports, and CAT Dealer Service Technician programs. Defendants are further ORDERED to ensure the destruction or return of any urine specimens previously collected from students who were not or have not since enrolled in the aforementioned programs and to refund the $50.00 fee any such students were assessed for the unconstitutional drug testing. This permanent injunction does not apply to any drug testing other than the testing conducted pursuant to the June 17, 2011 drug-testing policy that is at issue in this case.